Advanced Analytics, Inc. v. Citigroup Global Markets, Inc. Thank you, Your Honor. May I please the court? On behalf of Advanced Analytics, Inc., Your Honor, the court below granted a motion, defendant's motion, in defendant's favor, dismissing the complaint, although this litigation has lasted for close to 20 years. When there are lots of issues, complex issues, still material facts dispute, still in dispute, in existence. Your Honor, the plaintiff, on behalf of the plaintiff, they asserted the first claim is breach, the first claim is misappropriation of the trade secret. In order to prove misappropriation of trade secret, the plaintiff, of course, has to prove the first point is what is actually the trade secret here. Your Honor, although this is a very complicated IP case, intellectual property case, and I joined, I mean, I add on to this team, plaintiff's team, not too long ago, it took me a lot of time to understand what is actually trade secret is. Your Honor, Citibank, the defendant, before they met my client, they already have what they call a yield book program, which is calculating what's the present value for mortgage security, but the process they have, they utilize a process called, it's a simulator. It's a random number generator simulator. Monte Carlo code. Now, on the right-hand side is actually a portion of that kind of code, and that's what the defendant, they had before they met Dr. Wang, who is a mathematics genius. But that process takes a very long time to calculate all these different varieties of what they call past, or it's actually the interest scenarios that they write from those past history, and they combine all of these, and then very complicated mathematical process to generate an average, kind of average number. I cannot describe this in short, in two or three minutes, but however, Dr. Wang created another method, which is called, we call ACE. Mr. Tang, if I could just jump in. So we have the reason we understand, I think, the basic claim. And so I guess one of my questions is, the evidence in the record, what evidence has been presented to show that this ACE number sequence was, in fact, used by the defendants in creating their sequence, their program? Well, Your Honor, that was a mistake the corporate home made, a misunderstanding. The ACE is not, similarly, a program. ACE is actually a numerical data file. Now, these numerical data files. But I guess, and I'm sorry, Matt. I guess I'm still trying to direct you to what is the evidence that it was used, I guess, by the defendants? Well, the evidence we use of this, which only goes on the outside, because lots of discovery was blocked by the government. There were 20 years of discovery in this case. There was plenty of discovery in this case. Your side had access, from even before the lawsuit was filed, to the defendants' processes and the defendants' new ways to new system. Is there any evidence showing that the same information that was Mr. Wang's appears in the defendants' programs or in the defendants' number sequences or anything? Oh, yes. The expert testimony saying that the exam. Wait, the expert testimony that was excluded by the district court? Well, he still has a declaration, right? So he found, from defendants' program, there was a, inside this embedded in their program, there is a routine called get sequence. So in other words, if I could just give me time. When you run this case, case is- But you are referring to the stricken fan declaration, correct? It is stricken, but still the concept is when you run this program- Well, if you're going to rely on something that was stricken, I guess the prior question, then, is why do you believe that it was error to strike that declaration? Because the court- Excuse me, because if it was not error to strike that declaration, then, of course, you can't rely on that. Well, the reason is, the reason is, Your Honor, because the court below misunderstood the technology behind this. They thought they're comparing the sequences, like the court here. The ruling, the evidentiary ruling, striking the declaration was based on the failure to disclose it under the time allowed in the case management order for the disclosure of expert reports. So there's no misunderstandings of technology related to that, is there? Well, but the code itself is admissible, right? That was already there. So inside that code, there are routines. When you run that code, it gets a sequence, right? It gets this ace data from that numerical table, and then they process- Why do you say that when it says get sequence, it means get the ace sequence? Where does that come from? The ace sequence was the alleged stolen sequence. I understand that that's the alleged stolen sequence. What is the evidence that it was stolen? And you're telling me that the evidence is because it says get sequence. Why do we think that that means get the ace sequence rather than some other sequence that they have generated on their own efforts? Well, the outcome, when you run the program, the outcome was so similar to, as Dr. Fan testified, and even Judge Pittman- Please don't tell me about Dr. Fan until we have established that Dr. Fan's declaration is somehow available to us in the record. In other words, are you still relying on Dr. Fan as the answer? Because Judge Pittman described the results. He says the test, right, the only, Dr. Fan only tested 64 pads, right? Translation, Mr. Pittman. Okay, so in other words, but that means Dr. Fan's testimony or partial of this record was looked by the court, so it was not totally stricken. And that's why I can refer to Dr. Fan's that's why they would look at it. And they said Dr. Fan's testimony was the 64th, the simulation analyzer of this, but Pittman made a mistake. Pittman says the defendant did not even use 64 pads. The defendant independently developed, I mean, the 1,000 pads. But that's a material fact dispute here because the 1,000 pads does not even exist. That's- I have a question. There are two reply briefs. There's the reply brief that was filed on March 15th and signed by prior counsel, Mr. Toren. Right. And then you submitted a letter with a declaration seeking us to instead consider what you call March 13th reply brief. Is that correct? Correct, yes. Did you write this reply brief? No, I didn't write this reply brief. Yeah, so you submit, and in fact, it still has on the certificate of compliance, Mr. Toren's name. Well, it was his with markings by my kind. You're new counsel, but- I reviewed it. You're submitting a brief by Mr. Toren? Because you've asked us not to consider a brief by Mr. Toren. Well, it's revised. It's revised. You revised this? My kind revised this. It went candidly from a brief that I could understand to a brief that I couldn't understand. So I wanted to know whether you wrote this brief. No, I didn't write this brief. But you're asking us to consider this and not the earlier one? That's correct, yes.  So when- Do you have any knowledge of whether Mr. Toren wrote the original brief, or was that also written by your client? That I have no knowledge. That I have no knowledge. Not a brief, yeah. That I have no knowledge, yes. All I'm saying is, so the difference, so now when you run this program, so what, who is the scientist they hired by Citibank, and they, they actually- Actually, I think that's an alarm, but your time is actually up, so you've got some rebuttal. May I have your attention, please? May I have your attention, please? Mr. Chairman, this is Mike. Thank you very much. We didn't see you for long. We'd love to know that. Please stand by for more information as part of the interview. Once again, we just received an off-close notice. Please stand by for more information as part of the interview. Okay, all right, have a seat. We'll just hang on for a moment. Well, can I just, at one sentence, we'll finish it because it was interrupted. You'll have some time, remember. Just have a seat. We'll wait and see, hang on for a moment just to see if we need to take some kind of action. No, no, no. May I have your attention, please? May I have your attention, please? Mr. Chairman, this is Mike. Thank you very much. We just received an alarm about the building. Please stand by for more information as part of the interview. Once again, we just received an alarm about the building. Please stand by for more information as part of the interview. Judges of the United States, Court of Appeals for the Second Circuit. All right, thank you. Please be seated. Back from our recess, and all is apparently well. So we will continue with arguments. So we are ready to hear from Mr. Kessler. Good morning, Your Honors, and may it please the Court. Thomas Kessler from Cleary County.  We got Liebstein and Hamilton on behalf of the appellees. It strikes me, Your Honors, with respect to my friend on the other side, that for all their procedural twists and turns that this case has taken in its near 21-year history, at its core, it presents a relatively straightforward dispute. Appellant claims that my client, Citi, stole a series of proprietary numbers, the ace numbers, and used them either directly or indirectly in its yield book code. After two separate discovery periods over four years, two different judges reviewed the record and concluded in no fewer than eight written decisions that no reasonable juror could find for the appellant on any of its meaningful claims. In simple terms, appellant failed to adduce evidence that the appellees stole the ace numbers because, of course, they didn't. There is no basis to overturn the sound decisions below, nor the myriad other ancillary orders that are referenced in appellant's papers. And that's true for at least three reasons. First, the district court's grant of summary judgment correctly construed the legal standard and reviewed the evidence. Despite two discovery periods over 20 years, as Judge Lynch noted, appellant failed to identify any evidence to support its claims. At best, it put forward an expert who admittedly did not review any of the actual code used in the yield book and whose admissible opinions amounted to nothing more than a handful of stray circumstantial observations. Against that, and despite having no burden to do so, defendants below put forward powerful evidentiary statistical analysis through an expert who reviewed all of the code that is relevant to this case and determined there is no evidence of ace numbers, either directly or indirectly. Second, as was discussed already, the evidence that appellant says is the linchpin of its case, the fourth fan declaration, was correctly excluded. As Judge Nathan noted, it was filed too late, well after the close of discovery, and in violation of two prior court orders. In any event, the district court found that the arguments made in that report, even if they were to be considered, were not supported by the record and instead comprised little more than rank conjecture. And finally, although appellant continues to insist that it lost summary judgment because of claims of discovery misconduct and evidence fabrication, multiple judges have agreed that there has never been any evidence to support such a claim. At the outset, I'll note that we believe this appeal could be dispensed with on meaningful procedural grounds. Parties to cases before this court have an obligation to put their arguments clearly and cogently before your honors. We don't believe that the briefing in this case has done that. And panels in the circuit have not hesitated to dismiss appeals on that basis, even where the party in question is a pro se party, which appellant is decidedly not. That said, I'll turn right to the merits. Your honors, the first series of computer code that is relevant to this case is what's called the 100 path sequence. Under New York law, a claim for a trade secret misappropriation needs to be brought within three years of the last use of the alleged trade secret. Appellees below submitted undisputed evidence that the last use of the 100 path sequence occurred in February 2001. That was more than three years before the complaint in this action, which was filed in May 2004. And as the lower court correctly held, that renders AAI's claims on account of the 100 path sequence untimely. Moving to the remaining sequences, the appellant has always conceived of their claim in two pieces. There's the direct use or the indirect use. The direct use claim argues that appellees use the ace numbers directly in the yield book, plugging them right into the computer code. As the lower courts found, in order to establish misappropriation in direct use, you have to show substantial similarity between the code that you believe is the offending code and the trade secret. As the district court here found, the undisputed evidence in the record indicates that there is no statistical correlation or similarity between the yield book and the ace numbers. The only evidence that appellant even attempted to develop on this point was to have its expert compare an ace sequence to a small portion of a theoretical yield book sequence that a different non-testifying experts assistant created. That is, appellant admits that at no point did they actually review or analyze the real code that's used in the yield book. And moreover, despite having no obligation to do so, appellant produced expert evidence that did review the actual code used in the yield book and determined there is not a trace of the ace numbers in the code. On appeal, appellant argues that the district court mischaracterized this argument and insists that its real argument is that appellees stole the ace numbers through a sophisticated series of theft and use codes. But as the district court squarely held when it revisited this issue in 2019, appellant has failed to satisfy its evidentiary burden because it relies exclusively on unsworn lawyer interpretation of raw computer code, which we saw below and, again, we've seen here this morning, Your Honors. It's very clear law in this circuit that unsworn, non-expert testimony on things as complicated as computer code does not rise to the level of admissible evidence. Again, appellant's continued resort to the Fourth Van Declaration is unavailing because, as we've already discussed, it was stricken for merits purposes, and that's plainly what it's being used here for. There's also no evidence to support appellant's indirect use claim. This is the second version of the misappropriation claim, and in order to establish that, appellees have to show that the code that was in the yield book was substantially derived from the ace numbers. Again, after admitting or allowing appellant to have a 16-month period to conduct additional discovery specifically on this issue, on testing and development, the district court found that appellant failed to reduce any evidence to support its indirect use claim. And again, it's undisputed that appellant's expert did not even attempt to review the testing and development files. I don't think that there is any suggestion that the lower court misapplied the legal standard or reviewed the wrong evidence. Instead, the appellant continues to resort to the idea that the appellee's computer code that was produced in this case was phony or fabricated, and the so-called real files are somewhere in the bowels of city's records. That claim fails for a number of reasons. First, as Judge Pitman-Abley pointed out, appellant's claim is based on a kind of circular logic. They claim that the files we produced can't be the real files because the real files would show that we stole their trade secret, that we stole the ace numbers. But of course, that's precisely the claim that appellant needs to show in this case, not a fact in the world that they can use to bootstrap a claim of discovery misconduct. Second, the claims are simply meritless on their face. Lower courts have repeatedly heard appellant's claim of discovery misconduct, dating all the way back to 2012, and have found that there is simply no evidence in the record to suggest that the evidence produced in this case was incomplete or fabricated. And in fact, as Chief Judge Swain found many years ago, that plaintiff has everything that it needs to analyze the code that the defendants used in the yield book during the relevant period. To the extent that the appellant claims that the lower court engaged in some sort of improper weighing of the evidence, it simply misunderstands what the lower court did. Instead, the lower court looked at all of the evidence identified by appellant, and determined that even if it were taken at its face, to the full extent of its admissibility, it does not support any of the claims that appellant makes in its complaint, and certainly not sufficient to survive summary judgment. Very briefly, Your Honors, there were a number of ancillary claims that were dismissed on summary judgment. Those are all predicated on the underlying claim of misappropriation. And so they probably failed for the same reason that the claims for misappropriation failed. We've already heard quite a bit about the infamous Fan Declaration, so I'll touch on it just briefly. Again, in June of 2013, the fourth Fan Declaration was filed. It was done so in connection with the opposition to appellee's second motion for summary judgment. It happened nearly a year after the close of discovery, and was subject to being stricken on that basis, in addition to the fact that it violates the timely disclosure requirements in Rule 26a. It was also stricken for the reason that it expressly relied on and incorporated by reference a second Fan Reply Report, which itself was untimely and stricken in 2012. And Judge Pittman found quite rightly that the filing of the fourth Fan Declaration was an attempt to do indirectly what the court had already determined that the appellant could not do directly. Finally, Your Honors, there is, with the credits to appellant, there is one claim that they did prevail on, a technical violation of the NDA. We have been very clear that the violation is predicated on appellee's withholding or retention of what are called testing outputs. It's effectively what the testing system spits out when you're looking at various different kinds of code. There's no dispute in the record that that output or comparison report, as it's sometimes called, does not contain the ACE numbers, does not contain any ACE sequences. It is merely a series of MBS prices. There is no evidence in the record that the retention of that comparison report has any value, that it caused any damage. And so the lower court was quite right to hold that only nominal damages are permissible, and only $1 is the economic value of that claim can't be more than $1. I see my red light's about to be on, so I'll, unless your honors have any questions, I'm happy to answer them. I'm just curious what you would have us do with the reply briefs. It's a great question, Judge Nathan. I agree with you. I'm not quite sure how Mr. Toren can be seen to sign a brief that was filed after what seems to be a contentious withdrawal dispute. Of course, we don't have any insight into that because it was all done under seal. As we did say in our letter in response to Mr. Tung's letter, we understand from Mr. Toren's counsel that he only approved this signing of one brief. It was the brief that was filed in March of 2024. That said, I take appellant to their choice if they would prefer the court to review and rely only on the second reply brief. I don't think we have any meaning. We do not. Thank you, your honors. Thank you.  Before the interruption, I'd like to point out that Fenn's fourth report was not entirely stricken because pursuant to an order, according to my kind, I was not familiar myself, so I'd like to ask the court to go to the order issued by Pittman on June 6th, June 5th, 2014, which says Fenn's translation of code are all admissible. So this is one point. I have to move on to the second point. Judge said, what is the evidence that the defendant used? Now, in plaintiff's expert's report, they pointed out in the program, there is a routine called get code and save code. Now, I think they have some testimony or somewhere that the defendant does not, I mean, it's not necessary for defendant to save their own monocultural code. So the only code in the market, in the world, is the ace. So that's the, so in other words, this should be a battle between the expert, the court below. I'm sorry, can you just say the only code in the world is ace? Well, on sequence, a sequence. But the only sequence in the world is ace. Yeah, a sequence and the other ones. So any reference to get sequence has to be referring to ace? Is that what the question is? Well, there are only two machines out there, two programs out there. One is monocultural code, another one is ace. There's no evidence anywhere else, okay? But in any event, the lower court, for a motion for summary judgment, the lower court's job is to determine, is to spot, issue spotting. There are issues there, but he actually, I mean, Pittman jumps, the lower court jumps into, to make a- Actually, the lower court's job is not to spot issues. The lower court's job is to rule on the issues and the facts and the information that's presented by the parties. For motion for summary judgment, and they should spot, it's issue spotting, but they shouldn't, so it should be a battle of the expert during the trial. So the jury will hear both sides, I mean, expert's testimony, and the jury should be the fact finder to- Who is the expert that you are referring to at this moment that there should be a battle, their expert should battle with? Well, their expert is- Is that Mr. Fan? I know they're Polish and Redak, and both of them, as counsel- And your expert is- Is Fan. Okay. And the defendant's expert testified, they didn't even have access to your book's code, so they didn't have personal knowledge. For summary judgment to prevail, if the person puts in certification they do not have personal knowledge, that's a motion for summary judgment, shall be denied. And counsel- All right, Mr. Chang, I think we have your position, so we will take the case under advisement. Thank you for the argument from all counsel.